IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BARBARA E. TIMMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-628-SLR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Barbara E. Timmons, Blades, Delaware.  Pro se Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Patricia A. Stewart, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration.  Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Andrea A. Robertson, Esquire, Assistant Regional Counsel of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: December $\partial^{0}$ , 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Barbara E. Timmons ("plaintiff") appeals from a decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("defendant"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434. The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1]

Currently before the court are the parties' cross-motions for summary judgment. (D.I. 18, 23) For the reasons set forth below, plaintiff's motion will be denied and defendant's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a protective claim for DIB on March 2, 2009, alleging disability since the alleged onset date of October 26, 2002[2] due to a heart attack; chronic obstructive pulmonary disease ("COPD"); chronic bronchitis; artery disease; diabetes; depression; high blood pressure; emphysema; asthma; high cholesterol; leg and chest pain; gastroesophageal reflux disease; hypothyroidism; and issues with concentration, fatigue and forgetfulness. (D.I. 15, Tr. 174, 178) The relevant time-period is from the alleged onset date of October 26, 2002 through December 1, 2005, the date plaintiff

---

[1]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . 42 U.S.C. § 405(g).

[2]The original onset date was June 21, 1997. During the hearing before the administrative law judge ("ALJ"), plaintiff amended the alleged onset date of disability to October 26, 2002. (D.I. 15, Tr. 41, 165, 174)

was last insured. Plaintiff's application was denied initially and on reconsideration. (*Id.* at 86-91) On June 25, 2010, the ALJ issued an unfavorable decision denying the claim for DIB and plaintiff unsuccessfully sought review by the Appeals Council. (*Id.* at 14-75) On May 21, 2012, plaintiff, proceeding *pro se*, filed the current action for review of the final decision. (D.I. 2)

## B. Physical Impairments

In April 2001, plaintiff was diagnosed with smoking-related COPD/asthma. (D.I. 15, Tr. 240) In November 2002, she began treating with pulmonary specialists Emy Fernandez, M.D. ("Dr. Fernandez") and Amir Quefatieh, M.D. ("Dr. Quefatieh"), both of whom prescribed medications to treat the COPD. (*Id.* at 288, 442, 479, 482-84, 900) Dr. Fernandez's treatment notes from 2003 through 2005 indicate that plaintiff continued smoking despite being instructed to stop, she was sometimes non-compliant with CPAP use, and she stopped taking inhaled medication because she believed she was inhaling steroids. Her physical examinations were basically normal, except for a deep cough. (*Id.* at 438-42)

Plaintiff had episodes of bronchitis In 2002, 2004, and 2005. (*Id.* at 290, 330, 334, 438, 441) January 2004 progress notes from ear, nose, and throat specialists indicate that plaintiff's asthma, chronic bronchitis, and allergies were stable, as were her physical examination results. (*Id.* at 247-48) Chest x-rays taken in November 2004 revealed mild, chronic-appearing lung markings. (*Id.* at 895) As of October 2005, plaintiff used her Albuterol nebulizer nearly every four hours. (*Id.* at 445) Chest and rib x-rays taken in 2005 revealed no abnormalities. (*Id.* at 896)

Dr. Quefatieh's 2005 treatment notes indicate that, upon examination, plaintiff had no respiratory distress, her breathing was normal, and her leg no longer bothered her. The notes indicate that plaintiff is a chronic smoker who continues to smoke, refuses to take inhaled steroids because of alleged weight gain, and she was non-compliant with her CPAP machine treatment. Plaintiff had improved breathing after steroid and antibiotic treatments. (*Id.* at 286-91, 445-48)

Prior to the relevant time-frame, plaintiff was diagnosed with mild, non-critical coronary artery disease, and underwent two cardiac catheterizations. (D.I. 15, Tr. 256, 753-54) In July 2002, plaintiff's treating cardiologist, Anand B. Kartha, M.D. ("Dr. Kartha") completed a form in connection with plaintiff's application for long-term disability benefits. (*Id.* at 751-52) Dr. Kartha indicated that plaintiff's progress was unchanged; she exhibited marked limitation in her cardiac functional capacity; she had no mental limitations; she was totally disabled; and that vocational counseling and/or retraining would be recommended, as plaintiff was unable to be rehabilitated for her regular occupation. (*Id.* at 751-52)

In 2003, plaintiff's primary care physician Marie C. Wolfgang, M.D. ("Dr. Wolfgang") noted that plaintiff was in no acute distress, her heart condition was stable, she should stop smoking to address her COPD, and she should continue her psychiatric care and mental health medications. (*Id.* at 337-38) During a November 3, 2004 visit to Dr. Wolfgang, plaintiff reported that her cough was better, she was well, and was seeing a psychiatrist for counseling and medication. (*Id.* at 330) Dr. Wolfgang

3

again advised plaintiff to stop smoking. (*Id.* at 331) Plaintiff's lungs were clear during several visits to Dr. Wolfgang in 2004 and 2005. (*Id.* at 324, 327, 329)

On November 23, 2004, plaintiff presented to the emergency room with complaints that her heart symptoms had worsened. (*Id.* at 256) Plaintiff began treating with cardiologist Richard P. Simons, D.O. (Dr. Simons") who performed a cardiac catheterization on November 24, 2004 to assess the extent of plaintiff's coronary artery disease. (*Id.* at 264) The results indicated that plaintiff had a mild eccentric lesion in her proximal right coronary artery; mild plaquing throughout her left coronary system; and grossly normal left ventricle functioning. (*Id.* at 265)

An April 7, 2005 ECG showed non-specific T-wave changes. (*Id.* at 254). When Dr. Simons examined plaintiff on the same date, he noted that plaintiff continued to smoke against medical advice. He recommended that she abstain from tobacco use and continue her course of medications. (*Id.* at 254) Dr. Simons observed that, from a cardiac standpoint, plaintiff was stable and was within acceptable risk for her proposed surgery to repair her "trigger thumb." (*Id.* at 254)

When plaintiff presented to Dr. Wolfgang in September 2005, she reported that she felt good and had increased her activity. (*Id.* at 325) On October 13, 2005, Dr. Wolfgang completed a long-term disability form and opined that plaintiff was totally disabled due her chronic conditions, and would require a cardiologist opinion to determine whether she could participate in rehabilitation for any occupation. (*Id.* at 277-78) Dr. Wolfgang determined that plaintiff had marked functional limitations from her cardiac condition; moderate physical limitation of functional capacity; and moderate

4

limitations in mental capacity, as plaintiff reported a decreased ability to concentrate and handle stress. (*Id.* at 277-78)

Dr. Wolfgang noted in 2005 that plaintiff had a chronic cough and appeared congested. (*Id.* at 325-26, 331-32, 334-35) In December 2005, Dr. Wolfgang noted plaintiff's alcohol use, and recommended that she abstain from alcohol intake. (*Id.* at 324-26) Dr. Wolfgang's treatment notes indicate that plaintiff had mostly normal physical examination findings and was in no acute distress. (*Id.* at 320-40) A December 2005 treatment note indicates that plaintiff smoked at least a half-pack of cigarettes daily. (*Id.* at 290)

On June 20, 2006, V.K. Kataria, M.D. ("Dr. Kataria") completed a physical RFC assessment. (*Id.* at 356-62) Dr. Kataria concluded that plaintiff retained the physical capacity to perform sedentary work. (*Id.* at 469) Dr. Kataria found plaintiff only partially credible, noting that plaintiff continued to smoke despite her COPD and that her heart condition was stable. (*Id.* at 358) Dr. Kataria opined that plaintiff could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and needed to avoid concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (*Id.* at 358, 360-61)

On June 2, 2009, R. Palandjian, D.O. ("Dr. Palandjian"), completed a physical RFC assessment. (*Id.* at 526-32) Dr. Palandjian concluded that plaintiff remained

5

capable of performing sedentary work. (*Id.* at 531)  A. Aldridge, M.D. ("Dr. Aldridge")

affirmed Dr. Palandjian's findings on August 4, 2009. (*Id.* at 552).

### C. Mental Impairments

Plaintiff began treatment for depression in 1999, and intermittently received

counseling and medication through March 2003. (*Id.* at 872, 880-87, 912)  In August

2004, plaintiff began treatment with psychiatrists Dr. Israel ("Dr. Israel") and Dr. K.

Ahmed ("Dr. Ahmed"). (*Id.* at 295-300, 392-93)  At the initial intake visit with Dr. Israel,

plaintiff reported worsening depression. (*Id.* at 295)  A mental status examination

indicated that plaintiff retained short and long-term memory; was cooperative, alert, and

oriented; had moderate anxiety; exhibited depressed mood and thought content; and

had appropriate affect. (*Id.* at 298-300)  Plaintiff was diagnosed with major depression,

and assessed a Global Assessment of Functioning (GAF) score of 55, which indicates

moderate difficulty in social, occupational, or school functioning. (Tr. 300)  Dr. Israel

recommended medication management and individual therapy. (*Id.* at 300)

On May 27, 2004 plaintiff requested, and obtained, medication for depression

from Dr. Wolfgang, stating that Dr. Ahmed would not prescribe medication because she

owed him money. (*Id.* at 333)  Dr. Wolfgang contacted Dr. Ahmed's office to verify that

plaintiff was under psychiatric care while taking medication for depression and was told

that plaintiff was last seen in Dr. Ahmed's office in November 2003, that plaintiff had

missed a December 2003 appointment, and that there had been no appointments since

that time resulting in plaintiff's discharge from Dr. Ahmed's care. (*Id.* at 333)

6

In July 2004, plaintiff reported that her mental health counselor could not write a prescription for her mental health medication, and requested a prescriptions for the medications from Dr. Wolfgang. (Id. at 332) Dr. Wolfgang indicated that she would honor this request with no refills and that her office would no longer write prescriptions for plaintiff's mental health conditions. (Id. at 332) In October 2005, Dr. Wolfgang opined that plaintiff's reported decreased ability to concentrate and deal with stressful limitations made her incapable of working. (Id. at 278)

On May 16, 2006, Randy Rummler, M.D. ("Dr. Rummler"), completed a supplemental questionnaire regarding plaintiff's residual functional capacity ("RFC"). Dr. Rummler found plaintiff moderately impaired in most areas of functioning due to chronic depression. (Id. at 304-05)

J. Brandon, Ph.D. ("Dr. Brandon") completed a psychiatric review technique on May 22, 2006. (Id. at 306-19) Dr. Brandon identified plaintiff's depressive disorder and found that she remained capable of completing non-exertional tasks, socializing, and independently engaging in activities of daily living. (Id. at 318) He determined that plaintiff's conditions were primarily physical and that she was undermotivated. (Id. at 318) In addition, Dr. Brandon noted that mental health treatment indicated moderate interference due to anxiety and depression. He also noted that plaintiff's mental health record failed to substantiate that she had a severe, ongoing disabling mental condition, and that physical difficulties impinged on plaintiff's activities and demeanor. (Id. at 318)

Dr. Ahmed's treatment notes of February 6, 2008 indicate that upon mental status examination, plaintiff had intact insight and judgment; was alert, oriented, and

7

cooperative; showed logical speech and thought processes; and denied hallucinations and suicidal/homicidal ideation. (*Id.* at 389)  Plaintiff described her mood as "ok." (*Id.* at 389)  Dr. Ahmed assessed plaintiff with a GAF score of 65, which indicates only mild difficulty in social, occupational, or school functioning. (*Id.* at 390)  He concluded that plaintiff was stable on her medication regimen. (*Id.* at 390)

Pedro Ferreira, Ph.D. (Dr. Ferreira"), completed a psychiatric review technique and mental residual functional capacity assessment on May 31, 2009. (*Id.* at 509-25) Dr. Ferreira opined that plaintiff could engage in simple, routine work. (*Id.* at 524)  He noted that the mental health evidence indicated that plaintiff's functioning was moderately limited by depression, and did not include any recommendation for a higher level of psychiatric care. (*Id.* at 524)  On June 11, 2009, John Parker, M.D. ("Dr. Parker") adopted and confirmed Dr. Ferreira's opinion. (*Id.* at 533-37)  In addition, on July 31, 2009, Douglas Fugate, Ph.D. ("Dr. Fugate") affirmed Dr. Ferreira's findings. (*Id.* at 548, 551)

### D. Administrative Hearing

#### 1. Plaintiff's testimony

An administrative hearing was held on April 20, 2010. (*Id.* at 36-75)  Plaintiff appeared, represented by counsel.  Plaintiff was born on February 21, 1959 and was fifty-one on the date of the hearing. (*Id.* at 43)  She is married and lives with her spouse, son and one granddaughter.[3] (*Id.* 44)  She has a driver's license and is able to

---

[3]Plaintiff testified that her son is the major caretaker for her granddaughter, and that she mainly supervises her. (*Id.* at 66-67)

8

drive. (*Id.* at 44)  Plaintiff completed high school and is able to read, write, and at least do simple math. (*Id.* at 45)

Plaintiff worked for American General Life and Accident from October 1994 through February 2000 selling life insurance and collecting insurance premiums. (*Id.* at 45)  The job required her to drive to clients' homes and required lifting of a computer and briefcase.  When she was not visiting clients, plaintiff sat at a desk and used a computer and telephone. (*Id.* at 46)  Plaintiff stopped working after experiencing memory difficulties. (*Id.* at 47)  She received long-term disability until October 2009 due to legs, heart attack, and other problems. (*Id.* at 47)  Plaintiff filed for social security disability benefits because her company required her to. (*Id.* at 47)

Plaintiff suffered a myocardial infarction in 1997.  Plaintiff's physician advised her to stop working in 1997 but she worked off and on until 2000. (*Id.* at 53)  In 1998 she underwent an arteriogram with stent placement, followed by two heart catheterizations - one in 1999 and the other in 2004. (*Id.* at 50)  Plaintiff testified that during the relevant time-period,[4] she had constant chest pains, was treated for a heart condition and high blood pressure, had shortness of breath, numbness in her legs, suffered from depression, asthma, and sleep apnea, and was treated for a right trigger thumb (*Id.* at 48-57)  Plaintiff was treated with a number of medications with no negative side effects. (*Id.* at 58)  The medications taken for her psychological condition helped. (*Id.* at 68)

Plaintiff described a typical day as follows:  In the morning she gets up, gets her granddaughter up, takes her granddaughter to school, comes home, does the dishes,

---

[4]The time-frame from the alleged date of onset to the date plaintiff was last insured. (*Id.* at 49)

9

unloads the dishwasher, rests and finish the dishes. In the afternoon, she rests after lunch. (*Id.* at 65) Plaintiff testified that she could walk "maybe 50 feet," stand for 15 or 20 minutes, sit for 15 minutes before her legs would go numb, lift a gallon of milk, stand and bend at the waist, kneel, stoop to pick something off the floor, had no difficulty using her hands, had problems with long and short term memory and concentration, slept four hours a night, and rested every day. (*Id.* at 58-60) She was able to take care of her personal hygiene, cooked easy meals, sweep and scrub the floor, vacuum, dust, make beds, and do the laundry, although her son helped with the laundry. (*Id.* at 62-63, 69) Plaintiff's condition required her to sit and rest so she performed some of the tasks in increments. (*Id.* at 63) Plaintiff went grocery shopping with her spouse, who would carry the bags of groceries. (*Id.* at 63) She would drive to go on simple errands and go out to eat at restaurants. (*Id.* at 63-64) Plaintiff mowed the lawn using a riding lawn mower. (*Id.* at 63-64) Plaintiff took care of the family finances until approximately 2006 when her memory got too bad. (*Id.* at 64) Plaintiff attended social functions until a point in time when she did not want to be around people. (*Id.* at 64-65) Plaintiff testified that she stopped taking family vacations in 1999 because she was unable to walk very far. (*Id.* at 66)

### 2. VE's testimony

At the hearing, the VE testified that plaintiff's vocational background consisted of work as a life insurance agent which is light, skilled with a special vocational preparation (i.e., SVP) of 6. (*Id.* at 71) The VE opined that there were no transferrable skills to a lower level of exertion. (*Id.*)

10

The ALJ posed the following to the VE:

> Now, if we consider a hypothetical person who is approximately the claimant's dated age at the amended onset, the period of time we're talking about, '02 to '05, approximately 43 to 46 years of age. This individual has a 12th grade education, is able to read and write and do simple math such as adding and subtracting. There are certain underlying impairments that place limitations on the ability to do work-related activities. We'll start with a sedentary level of exertion, posturals all occasional but there should be no climbing of any ladder, rope, or a scaffold. Avoid concentrated exposure to temperature extremes, wetness, humidity, odors, dust, gas, poor ventilation, and hazards. Finally, this individual would require simple, unskilled work, work not at a production pace. To me that means paid by the piece or working at an assembly line. I'm assuming that you would rule out the one past relevant work.

(*Id.* at 72) The VE replied, "[y]es, ma'am." (*Id.*)

Next, the ALJ asked the VE:

> Would there be any simple, unskilled work such a person could do in the regional or national economy that would fit within the parameters of the hypothetical?

(*Id.*) The VE responded, "[y]es, ma'am . . . at the sedentary, unskilled level,[5] we have

addresser . . . . order clerk for food and beverage . . . . telephone quotation [clerk] . . . .

(*Id.* at 72-73) On cross-examination, the VE was asked:

> So, given a hypothetical individual who would only be able to sit two hours in an eight-hour workday, stand, walk no more than one hour in an eight-hour workday and can lift no more than 20 pounds or carry 10 pounds. Would such an individual be able to perform in the national economy?

---

[5]The Social Security Regulations define sedentary work as follows: "Sedentary-work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

(*Id.* at 73)  The VE responded, "[n]ot on a full-time basis."  (*Id.*)  When asked what

impact there would be on an individual's ability to perform work if the individual needed

to miss work more than three times a month, or if the individual was off-task to the

extent there would be a 10 to 15 percent decrease in productivity, or if the individual

was unable to accept instructions or respond appropriately to criticism from supervisors,

the VE replied in each instance that there would be no work due to loss of productivity.

(*Id.* at 73-74)

### E. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ

determined that plaintiff had not been under any type of disability within the meaning of

the Act from October 26, 2002 through the date last insured.  The ALJ's findings are

summarized as follows:[6]

> 1.  The claimant last met the insured status requirements of the Social
> Security Act on December 1, 2005.
>
> 2.  The claimant did not engage in substantial gainful activity during the
> period from her alleged onset date of October 26, 2002 through her date
> last insured of December 1, 2005 (20 C.F.R. § 404.1571 *et seq.*).
>
> 3.  Through the date last insured, the claimant has the following severe
> impairments:  coronary artery disease, chronic obstructive pulmonary
> disease, and depression (20 C.F.R. § 404.1520(c)).
>
> 4.  Through the date last insured, the claimant did not have an impairment
> or combination of impairments that met or medically equaled one of the
> listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20
> C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

---

[6]The ALJ's rationale, which was interspersed throughout the findings, is omitted
from this recitation.

12

5. Through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she could never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; needed to avoid concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (machinery, heights, etc.); and was mentally limited to simple, unskilled work not at a production pace.

6. Through the date last insured, the claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on February 21, 1959 and was 46 years old, which is defined as a younger individual age 18-44, on the date last insured. The claimant subsequently changed age category to a younger individual age 45-49 (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).

11. The claimant was not been under a disability, as defined in the Social Security Act, at any time from October 26, 2012, the alleged onset date, through December 1, 2005, the date last insured (20 C.F.R. § 404.1520(g)).

(D.I. 15, Tr. 17-35)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are

conclusive if they are supported by substantial evidence. See 42 U.S.C. §§ 405(g),

1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether

13

"substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of "evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50( a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict

should not be directed." *See Id.* at 250-51 (internal citations omitted).  Thus, in the

context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the

substantiality test if [the ALJ]  ignores, or fails to resolve, a conflict created by

countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other

evidence-particularly certain types of evidence (e.g., that offered by treating physicians)

- or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*,

786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d

Cir. 1983)).  Where, for example, the countervailing evidence consists primarily of the

plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective

pain and specify his reasons for rejecting these claims and support his conclusion with

medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases,

'appellate courts retain a responsibility to scrutinize the entire record and to reverse or

remand if the [Commissioner]'s decision is not supported by substantial evidence.'"

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d

968, 970 (3d Cir. 1981)).  "A district court, after reviewing the decision of the

[Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the

[Commissioner]'s decision with or without a remand to the [Commissioner] for

rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1 )(D), "provides for the

payment of insurance benefits to persons who have contributed to the program and

15

who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(1) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed

severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii);

*Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an

impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R.

§ 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to

meet or medically equal any listing, the analysis continues to steps four and five. *See*

20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC

to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant

is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A

claimant's RFC is "that which an individual is still able to do despite the limitations

caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir.

2001). "The claimant bears the burden of demonstrating an inability to return to h[er]

past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude her from

adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding

of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At

this last step, the burden is on the Commissioner to show that the claimant is capable

of performing other available work before denying disability benefits. *See Plummer*,

186 F.3d at 428. In other words, the Commissioner must prove that "there are other

jobs existing in significant numbers in the national economy which the claimant can

perform, consistent with her medical impairments, age, education, past work

experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the

17

cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Whether ALJ's Decision is Supported by Substantial Evidence

On June 25, 2010, the ALJ found that plaintiff had not been under any type of disability within the meaning of the Act from October 26, 2002, through the date plaintiff was last insured. The ALJ concluded that, despite plaintiff's severe impairments (coronary artery disease, COPD, and depression), she retained an RFC to perform sedentary work except that she could never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; needed to avoid concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (machinery, heights, etc.); and was mentally limited to simple, unskilled work not at a production pace. After considering the VE's testimony, the ALJ concluded that plaintiff could not perform her past work, but could perform a significant number of other jobs in the national economy, including addresser, order clerk, and telephone quotation clerk.

Plaintiff contends that the ALJ erred in not adopting the opinions of her treating physicians, Dr. Wolfgang and Dr. Kartha. Defendant contends that the opinions of Drs. Wolfgang and Kartha were unsupported by their own records, the records from plaintiff's other treating sources, evaluations from state agency consultants, and state agency psychologists. In addition, plaintiff argues that the ALJ erred in assessing her credibility. Defendant argues that plaintiff improperly submitted additional evidence on appeal. Finally, defendant contends that substantial evidence supports the decision that plaintiff was not disabled under the Act.

### 1. Credibility

Plaintiff appears to argue that the ALJ did not give sufficient weight to her testimony. The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment.

An ALJ must give great weight to a claimant's testimony only "when this testimony is supported by competent medical evidence," and an ALJ may "reject such claims if he does not find them credible." *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible." *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).

Under 20 C.F.R. § 404.1529(c)(3), the kinds of evidence that the ALJ must consider, in addition to the objective medical evidence, when assessing the credibility of an individual's statements include: the individual's daily activity; location, duration, frequency, and intensity of the individual's symptoms; factors precipitating and aggravating the symptoms; the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; treatment, other than medication, received for relief of the symptoms; any non-treatment measures the individual uses to relieve pain or symptoms; and other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). In addition, the ALJ should account for the claimant's statements, appearance, and demeanor; medical signs and laboratory findings; and physicians' opinions regarding the credibility and severity of plaintiff's subjective complaints. Social Security Ruling

19

96-7p, 1996 WL 374186 (S.S.A. 1996). The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see also Schaudeck,* 181 F.3d at 433.

The ALJ discussed in detail her reasons for finding plaintiff's testimony "not credible." Indeed, plaintiff's testimony regarding her daily activities undermines the credibility of her subjective complaints. She testified that she was able to engage in several activities of daily living including housing keeping, shopping, mowing the lawn on a riding lawn mower, and caring for her granddaughter. In addition, the record reflects that plaintiff vacationed on two occasions, but when asked about it during the administrative hearing, testified that she had not been on vacation. Finally, plaintiff's failure to follow recommendations by physicians and/or to take medication as prescribed undermines her credibility.

For the above reasons, the court finds that ALJ did not err in finding plaintiff's statements "not credible."

### 2. New evidence

Plaintiff submitted additional medical records with her motion for summary judgment, some of which were not before the ALJ when she rendered her decision. When a claimant submits evidence after the ALJ's decision, that evidence cannot be used to challenge the ALJ's decision on the basis of substantial evidence. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Pursuant to 42 U.S.C. § 405(g), sentence six, this court may, however, order a remand based upon evidence submitted

after the ALJ's decision, but only if the evidence satisfies three prongs: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ. *Matthews*, 239 F.3d at 593.

Plaintiff does not meet the required prongs. First, the majority of the evidence is new and, hence, is not material to plaintiff's claim for benefits from October 26, 2002, the alleged onset date, through December 1, 2005, the date plaintiff was last insured. Many, if not all, of the new records are dated at a time after the disability period in question. "[A]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *see also Nieves v. Commissioner of Soc. Sec.*, 198 F. App'x 256, 260, n.3 (3d Cir. 2006) (unpublished) ("Our determination [that the ALJ's decision in 2001 was based on substantial evidence] is in no way swayed by the fact that in October of 2003 an ALJ determined that the petitioner was disabled. As per 42 U.S.C. § 405(g), [the court's] review is limited to the evidence in the record at the time of the 2001 decision of the ALJ and [it is] therefore not required, nor able, to consider this subsequent ALJ ruling when rendering [its] decision."); *Bruni v. Astrue*, 773 F. Supp. 2d 460, 473-74 (D. Del. 2011) ("The fact that [a] subsequent application was successful does not itself meet the new evidence standard articulated in *Szubak*."). Second, plaintiff provided no explanation, much less good cause, for her failure to present the

21

records she filed on May 7, 2013. Hence, the court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).[7]

### 3. Medical opinions

Plaintiff contends that the ALJ erred in not adopting the opinions of her treating physicians, Drs. Wolfgang and Kartha. An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Opinions of a treating physician are entitled to controlling weight only when they are well-supported and not inconsistent with other substantial evidence in the record. *See Hall v. Commissioner of Soc. Sec.*, 218 F. App'x 212, 215 (3d Cir. 2007) (unpublished) (affirming ALJ's decision to give little weight to treating physician's reports because of "internal inconsistencies in various reports and treatment notes . . . as well as other contradictory medical evidence"); *Fargnoli*, 247 F.3d at 43.

In the opinion, the ALJ detailed her reasons for affording less weight to the opinions of Drs. Wolfgang and Kartha. The ALJ noted that Dr. Wolfgang's opinions were inconsistent with the record as a whole. More particularly, Dr. Wolfgang: (1) opined that plaintiff was disabled and unable to work during a time period when plaintiff was working; (2) did not have access to plaintiff's entire medical record; (3)

---

[7]Plaintiff has available the option of filing a new application should she believe the new evidence supports an award for DIB benefits. *See* 20 C.F.R. § 416.330(b).

failed to provide any reference to objective medical testing to support her opinions; and (4) provided opinions that are inconsistent with her treatment notes.[8]

With regard to Dr. Kartha, the ALJ gave less weight to his opinion, explaining that Dr. Kartha's 2002 opinion was internally inconsistent, as well as inconsistent with and contradicted by the record as a whole. For example, Dr. Kartha indicated that plaintiff was totally disabled, but then recommended vocational counseling and/or retraining.

The ALJ cited to the medical evidence record to support her decision to give less weight to the opinions of Drs. Wolfgang and Kartha. Cardiac treatment records from Dr. Simons indicated that plaintiff's cardiac condition was stable, and she was doing well. In addition, during the relevant time-period plaintiff was continually urged by numerous physicians to stop smoking, and failed to do so.[9] Moreover, other medical records did not support the opinions of Drs. Wolfgang and Kartha. The records of Dr. Quefatieh indicate that upon examination, plaintiff had no respiratory distress, reported normal breathing, her leg no longer bothered her, was a chronic smoker who continued to smoke despite encouragement to stop smoking, refused to take inhaled steroids because she claimed they made her gain weight, was non-compliant with her CPAP

---

[8]The ALJ did not consider Dr. Wolfang's opinions regarding disability for the years 2006, 2007, and 2009, because no clear time period of reference was provided.

[9]The ALJ appropriately made reference to plaintiff's noncompliance with medical care and treatment (i.e., the failure to stop smoking and stopping or refusing to take medication). To obtain medical benefits, a claimant "must follow treatment prescribed by . . . [a] physician if . . . [that] treatment can restore . . . [the claimant's] ability to work." 20 C.F.R. § 404.1530.

machine treatment, and had improved breathing after steroid and antibiotic treatments. Dr. Fernandez's treatment notes from 2003 through 2005 indicate that plaintiff continued smoking despite being instructed to stop, was sometimes non-compliant with CPAP use, stopped taking her prescribed medication because she thought it was inhaled steroids, and had mostly normal physical examination results except for a deep cough. In addition, contrary to the opinions of Drs. Wolfgang and Kartha, plaintiff was able to care for her granddaughter, do some lawn care, wash laundry, drive, handle a savings account, and prepare simple meals. Finally, state agency physician Drs. Kataria and Palandjian concluded that plaintiff retained the physical capacity to perform sedentary work, as Dr. Wolfgang indicated in 2005, and Dr. Ferreira opined that plaintiff would be able to engage in simple, routine work.

After a careful review of the evidence of record and considering plaintiff's and defendant's positions, the court finds that the ALJ did not err in giving less weight to the opinions of Dr. Wolfgang and Dr. Kartha. In addition, the court concludes that substantial evidence supports the ALJ's decision that plaintiff could perform a limited range of sedentary work, that jobs existed in significant numbers in the national economy that she could have performed, and that she was not disabled from October 26, 2002 through the date she was last insured, December 31, 2005.

## V. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted.

An appropriate order shall issue.

24